**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID WRIGHT, | ) | CASE NO. 1:24-CV-01939-DAR |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE JENNIFER |
| LELAND DUDEK, | ) | DOWDELL ARMSTRONG |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      INTRODUCTION

Plaintiff David Wright ("Mr. Wright") seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Social Security Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated November 6, 2024). For the reasons set forth below, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND this matter for further proceedings consistent with this Report and Recommendation.

## II.     PROCEDURAL HISTORY

On August 19, 2021, Mr. Wright filed an application for DIB, alleging an onset date of July or August 2020. (Tr. 688). On September 21, 2021, Mr. Wright filed a second application for DIB, alleging an onset date of July 1, 2020. (Tr. 696). Mr. Wright's second application related to his schizoaffective disorder; panic disorder; catatonic schizophrenia;

major depressive disorder; sedative, hypnotic, or anxiolytic abuse; arthritis; nerve damage; ulnar nerve surgery, left arm; broken leg surgery with plates and screws; attention deficit hyperactivity disorder ("ADHD"); depression; and severe anxiety. (Tr. 721).

The Social Security Administration ("SSA") denied Mr. Wright's application initially and upon reconsideration. (Tr. 585, 596). Mr. Wright requested a hearing before an administrative law judge ("ALJ"). (Tr. 625). The ALJ held a hearing on July 21, 2023, at which Mr. Wright was represented by counsel. (Tr. 547). Mr. Wright testified, as did an impartial vocational expert ("VE").

On October 13, 2023, the ALJ issued a written decision, finding that Mr. Wright was not disabled. (Tr. 523). The ALJ's decision became final on September 5, 2024, when the Appeals Council declined further review. (Tr. 317).

On November 6, 2024, Mr. Wright filed his complaint, challenging the Commissioner's final decision. (ECF No. 1). Mr. Wright asserts the following assignment of error:

(1)     Whether the ALJ's assessment of psychiatric nurse practitioner Ashley King APRN's *Off-Task/Absenteeism Questionnaire* is supported by substantial evidence.

(ECF No. 8, PageID # 6971).

## III.     BACKGROUND

### A.     <u>Personal, Educational, and Vocational Experience</u>

Mr. Wright was born in 1985 and was 35 years old on his alleged onset date. (Tr. 696). He is not married and has no children. (Tr. 696-97). Mr. Wright has a high school diploma. (Tr. 722). He has prior work experience as a cook and a machine operator. (Tr. 537).

###### B.  Relevant Hearing Testimony

###### 1.  *Mr. Wright's Testimony*

Mr. Wright testified that he was currently living at a facility for people with dual diagnoses. (Tr. 551). He testified that, on some days, his auditory hallucinations bombard him from the moment he wakes up. (Tr. 552). The voices tell him that they are going to hurt him and that they want to make him suffer. (Tr. 552-53). As a result of the voices, Mr. Wright feels afraid, helpless, and hopeless. (Tr. 552). He also testified that the voices prevent him from being able to use the bathroom and that he has to use catheters. *Id*. Mr. Wright further testified that his head hurts constantly. *Id*.

Mr. Wright testified that he has cycled through almost every antipsychotic medication. (Tr. 554). He testified that he is currently on Haldol, Saphris, and Klonopin, which he takes as prescribed without assistance from anyone else. (Tr. 554-55). He testified that, if it were not for the medication, he would be in the hospital nonstop. (Tr. 558). He further testified that he has not had a drink in over five years and that he has not used any illegal substances since February 2020. (Tr. 551).

Mr. Wright testified that he feels like no one understands him and that he has lost all his friends. (Tr. 553). He struggles being around people because they cannot relate to him. (Tr. 558-59). He further testified that his auditory hallucinations make it difficult for him to concentrate. (Tr. 560-61).

###### 2.  *Vocational Expert's Testimony*

The VE testified that a hypothetical individual with Mr. Wright's characteristics could not perform his past work but could perform jobs existing in significant numbers in the national economy, including work as a cleaner, hospital cleaner, or store laborer. (Tr. 563).

The VE also testified, however, that it would be work-preclusive if the hypothetical individual needed to frequently work in isolation or would be absent from work three times per month. (Tr. 564). In response to a question from Mr. Wright's counsel, the VE also testified that it would be work preclusive if the hypothetical individual required two additional, unscheduled 15-minute breaks during the workday. (Tr. 566).

### C.     Relevant Opinion Evidence[1]

#### 1.     Ashley King, MSN-ED, APRN

On July 21, 2023, Nurse King filled out three forms: (1) a medical statement concerning depression, bipolar, and related disorders; (2) a medical statement regarding mental impairments with possible substance abuse; and (3) an off-task/absenteeism questionnaire. (Tr. 6910-12).[2]

In the medical statement concerning depression, bipolar, and related disorders, Nurse King opined that Mr. Wright had a mild limitation in his ability to understand, remember, or apply information; a marked limitation in his ability to interact with others; and extreme limitations in his ability to adapt or manage himself and his ability to concentrate, persist, or maintain pace at tasks. (Tr. 6910). In the medical statement regarding mental impairments with possible substance abuse, Nurse King opined that Mr. Wright was not currently abusing drugs or alcohol. (Tr. 6911). In the off-task/absenteeism questionnaire, Nurse King opined that Mr. Wright would likely be off-task at least 20% of the time and would be absent from work approximately four times per month as a result of his psychosis and hallucinations. (Tr.

---

[1] While the ALJ determined that Mr. Wright suffers from a number of severe impairments, Mr. Wright challenges only the ALJ's treatment of Nurse King's off-task/absenteeism questionnaire, in which Nurse King based her opinions on Mr. Wright's psychosis. Therefore, this Report and Recommendation does not discuss medical evidence relating to his other impairments.

[2] As discussed below, the parties dispute whether the three forms constitute multiple different opinions or one single opinion.

6912).

The ALJ found that the limitations Nurse King identified in her medical statement regarding depression, bipolar, and other disorders were unpersuasive because she did not list a substance abuse disorder in Mr. Wright's list of diagnoses and because Mr. Wright's recent examinations did not support any significant, abnormal findings. (Tr. 536-37). The ALJ also found that Nurse King's opinions were inconsistent with Mr. Wright's improvement during inpatient hospitalizations and with the conservative treatment he received during periods of sobriety. (Tr. 537). The ALJ did not expressly address Nurse King's off-task/absenteeism questionnaire.

### 2. *State Agency Psychologists*

On July 6, 2022, Kristen Haskins, Psy.D., a state agency psychologist, opined that Mr. Wright had moderate limitations in numerous functional categories. (Tr. 592-93). Dr. Haskins further opined that Mr. Wright was capable of completing simple, short cycle tasks in an environment without fast paced demand and where he could work away from the distractions of others. (Tr. 593). Dr. Haskins also opined that Mr. Wright had the ability to maintain effective social interactions with a trusted supervisor, would not do well with multiple points of contact, and could interact only occasionally and superficially with coworkers and the general public. *Id*. Finally, Dr. Haskins opined that Mr. Wright could adapt and manage himself in a structured and predictable work setting, that major changes needed to be explained, and that he needed time to adjust to new expectations. (Tr. 594). On September 8, 2022, Jaime Lai, Ph.D., concurred with Dr. Haskins' opinions on reconsideration. (Tr. 603).

### D.    <u>Relevant Medical Evidence[3]</u>

On September 1, 2020, Mr. Wright was taken to the Lake Health emergency room by the police after he displayed symptoms of psychosis, erroneously claimed that three men with guns were at his mother's house threatening her life. (Tr. 4809-10). He tested positive for amphetamines, benzodiazepines, and cannabis. (Tr. 4810).

Mr. Wright went to the emergency room again on October 31, 2020. (Tr. 4679). He reported that he was self-medicating with Etizolam and said that he was hearing voices. (Tr. 4680). He was unable to provide a reliable medical history and stated that he was hearing voices in the middle of the night. (Tr. 4705). On examination, he was anxious and paranoid with poor insight and judgment and disorganized thought processes. *Id*. His toxicology screen was positive for THC, amphetamines, and benzodiazepines. *Id*. He was diagnosed with acute psychosis, polysubstance abuse, and acute drug-induced psychosis. (Tr. 4679).

On January 14, 2021, Mr. Wright had a telehealth appointment at the KC Center for Health and Wellness. (Tr. 6168). He reported that his anxiety symptoms had increased in frequency and intensity but denied any psychiatric problems or symptoms. *Id*.   On examination, Mr. Wright was oriented to time and place with a euthymic mood, normal speech, logical thinking, and appropriate thought content. *Id*. He denied suicidal ideation, and there were no indications that he was experiencing hallucinations or delusions. *Id*. He was diagnosed with opioid dependence, generalized anxiety disorder, and ADHD. *Id*.

Mr. Wright had a follow-up telehealth appointment on February 23, 2021. (Tr. 6170). He presented as friendly, distracted, and anxious, with normal speech, intact language skills, a normal mood, and appropriate affect. (Tr. 6171). He did not display any signs of

---

[3] The administrative record is extensive, totaling nearly 7,000 pages. My summary of Mr. Wright's medical history is limited to the portions of the record that the parties have identified in their briefs.

hallucinations, delusions, or other indicators of psychosis. *Id*. Cannabis dependence, sedative abuse, and major depressive disorder were added to his list of diagnoses. (Tr. 6172). It was noted that his substance abuse was an active problem requiring treatment and monitoring. *Id*.

Mr. Wright attended another telehealth appointment on March 5, 2021. (Tr. 6175). On examination, he was downcast, distracted, and unhappy, with normal speech, an appropriate affect, logical thought processes and thought content, and appropriate cognitive functioning. (Tr. 6176). There were no signs of hallucinations, delusions, or other indicators of psychotic processes. *Id*.

Mr. Wright saw Nurse King on April 6, 2021. (Tr. 6185). He reported continuing anxiety, ADHD, depression, and psychotic processes. (Tr. 6185-86). Nurse King also noted that others observed Mr. Wright displaying a suspicious demeanor and signs of paranoid process. (Tr. 6186). He reported that his psychotic symptoms were less frequent or intense. *Id*. His urine was positive for THC. *Id*. On examination, he was downcast, irritable, and unhappy, but displayed no signs of hallucinations, delusions, bizarre behaviors, or other psychotic thought processes. (Tr. 6187). His insight, judgment, and affect were appropriate, and his behavior was cooperative and attentive. *Id*. Notes from the Cleveland Clinic from the same day state that Mr. Wright was not a candidate for electroconvulsive therapy and that chemical dependency was the primary cofounder for his cluster of psychiatric complaints. (Tr. 3219). He was diagnosed with substance related psychotic disorder. *Id*.

Mr. Wright had another follow-up visit with Nurse King on April 20, 2021. (Tr. 5581). He reported that he was feeling worse and that he was having issues with his mother regarding a package he believed she misappropriated. *Id*. Mr. Wright reported worsening anxiety symptoms, difficulty sleeping, and constant depression. (Tr. 5581-82). He also reported

symptoms of psychotic processes, which he said were present intermittently. (Tr. 5582). Treatment notes state that others observed Mr. Wright displaying a suspicious demeanor and other signs of a paranoid process. *Id*. Mr. Wright admitted to using cannabis, reported substance withdrawal symptoms, and stated that he associated his paranoid feelings with withdrawal. (Tr. 5582). A urine test was positive for THC. *Id*. On examination, it was noted that psychotic or borderline psychotic symptoms appeared to be present, and that Mr. Wright expressed delusional ideas. (Tr. 5582-83).

On April 27, 2021, Mr. Wright reported continuing anxiety, but denied manic symptoms, hallucinations, delusions, or other symptoms of psychotic process. (Tr. 5575). He also admitted using cannabis, and his urine was positive for THC, though it was noted that he was tapering down. (Tr. 5575-76). On examination, Mr. Wright displayed normal speech, depressed thought content, appropriate affect, logical thinking, and normal cognitive function, insight, and knowledge. (Tr. 5576). He did not display signs of hallucinations, delusions, bizarre behaviors, or other symptoms of psychotic process. *Id*. At a teletherapy visit on May 14, 2021, at which Mr. Wright's exam findings were largely normal, it was recommended that he enroll in an intensive outpatient program. (Tr. 6191-92).

On May 18, 2021, Mr. Wright informed Nurse King that his prescription Saphris "quiets the voice a little." (Tr. 5564). Mr. Wright also reported daily symptoms of a panic disorder, including palpitations, sweating, and trembling. *Id*. He did not present with psychotic symptoms but continued to describe signs and symptoms of psychotic process. *Id*. Nurse King stated that the frequency of Mr. Wright's hallucinations appeared to be unchanged and that others observed him displaying a suspicious demeanor and other signs of paranoid process. (Tr. 5565). Mr. Wright again tested positive for THC. *Id*. On examination, he did not

display signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process. *Id*. Nurse King noted that Mr. Wright continued to experience psychosis, including paranoia and auditory hallucinations, despite his current medication regimen. (Tr. 5567). She increased Mr. Wright's level of care, raising it from outpatient treatment to an intensive outpatient program in light of his substance abuse issues. *Id*.

Mr. Wright reported no hallucinations or delusions on May 25, 2021. (Tr. 5594). A drug test was positive for THC, but Nurse King noted that his levels of THC were trending down. (Tr. 5594-95). Nurse King also reported that Mr. Wright's depression and psychosis had decreased significantly since he changed antipsychotics and began taking Valium. (Tr. 5598).

Mr. Wright had another follow-up visit with Nurse King on June 1, 2021. (Tr. 5587). He reported that his symptoms of psychosis were worsening and that he was having a slight increase in auditory hallucinations. *Id*. He said that he was attempting to ignore the voices but that he was beginning to feel overwhelmed. *Id*. Nurse King stated that Mr. Wright's symptoms had increased in frequency or intensity and that others' description of his behavior suggested that auditory hallucinations were occurring. *Id*. On examination, he was irritable, and Nurse King could not determine if underlying psychotic symptoms were present. (Tr. 5588). However, she also noted that signs of hallucinations, "presumably due to withdrawal," could be observed. *Id*. His urine was positive for THC, but his levels continued to decrease. *Id*.

On June 8, 2021, Mr. Wright reported that his episodes of paranoid process had increased in frequency. (Tr. 5639). Nurse King noted that psychotic or borderline psychotic symptoms appeared to be present, and that Mr. Wright's behavior suggested that he was

9

experiencing auditory hallucinations. (Tr. 5640). Mr. Wright also displayed psychotic symptoms on June 29, 2021. (Tr. 6200).

On July 13, 2021, Mr. Wright reported that his psychotic symptoms were less frequent, but Nurse King also noted that his hallucinations appeared to be occurring with the same frequency. (Tr. 5613). Mr. Wright did not display any signs of hallucinations or delusions on examination. *Id*. Nurse King noted that she was not comfortable increasing Mr. Wright's medication due to his history of addiction, but also stated that she would not discontinue his benzodiazepine prescriptions because of active psychosis and potential worsening anxiety symptoms. (Tt. 5615-16).

On July 20, 2021, Nurse King noted that Mr. Wright was continuing to experience auditory hallucinations at the same frequency. (Tr. 5606). However, he did not show apparent signs of hallucinations or delusions on examination. (Tr. 5607). On July 27, 2021, Mr. Wright reported experiencing delusions that his neighbors were spying on him, and Nurse King noted that psychotic symptoms were "chronically present." (Tr. 5600).

Mr. Wright was admitted to the Cleveland Clinic on July 31, 2021. (Tr. 3407). It was noted that, when he arrived, he displayed severe persecutory paranoia, auditory hallucinations of persecution, and disorganized though process. (Tr. 3408). He was diagnosed with schizoaffective disorder and excited catatonia. *Id*. He received medication and electroconvulsive therapy. *Id*. At discharge, his paranoia and hallucinations had improved, and he denied all symptoms. *Id*.

On August 24, 2021, Mr. Wright had a follow-up visit with Nurse King, during which he denied experiencing delusions or hallucinations. (Tr. 5705). His drug screen was clean. (Tr. 5706). On August 27, 2021, Mr. Wright's mother reported that his psychosis had

increased in severity and that he was experiencing paranoid delusions that his neighbors wanted to hurt him. (Tr. 5701). Nurse King added catatonic schizophrenia to Mr. Wright's list of diagnoses. (Tr. 5702).

Mr. Wright presented without apparent signs of hallucinations or delusions on September 2, 2021. (Tr. 6241-42). On September 24, 2021, it was noted that Mr. Wright's mother needed to keep and dispense all of Mr. Wright's medications. (Tr. 5693). Mr. Wright's mother also reported that he had an altercation with her new husband. *Id*. Mr. Wright did not report hallucinations or delusions. *Id*.

Mr. Wright was admitted to the Cleveland Clinic emergency room again on September 9, 2021, complaining of worsening auditory hallucinations and paranoia. (Tr. 3509). He received electroconvulsive therapy and was admitted. (Tr. 3509). It was noted that his presentation did not appear consistent with excited catatonia. *Id*. It was also noted that Mr. Wright was fixated on received diazepam. *Id*. At discharge on September 21, 2021, Mr. Wright's mood and affect were improved, and there was no evidence of hallucinations, disorganized behavior, or internal stimulation. *Id*. Mr. Wright was admitted to the emergency room again on September 29, 2021, at which point his toxicology screen was positive for THC and benzodiazepines. (Tr. 3544).

Mr. Wright went to the emergency room again on October 5, 2021, complaining of worsening hallucinations and anxiety. (Tr. 4997). His chronic catatonia was prevalent. *Id*. His medications were adjusted, and he no longer reported hallucinations at the time of discharge on October 13, 2021. (Tr. 4998).

Mr. Wright saw Nurse King again on October 29, 2021. (Tr. 5678). Mr. Wright reported that his symptoms had improved, but Nurse King noted that others reported he was

having difficulty expressing a logical series of ideas. *Id*. A drug screen was negative for drugs other than his prescription medication. (Tr. 5679). On examination, Mr. Wright did not display signs of hallucinations or delusions. *Id*.

On November 5, 2021, Mr. Wright reported that he was living in a hotel due to difficulties with his mother's husband. (Tr. 5673). He also reported that his psychotic symptoms were intermittently present, and Nurse King noted that his symptoms were less frequent and intense. *Id*. Nurse King also noted that his episodes of paranoia had decreased but his hallucinations had not. (Tr. 5673). However, Mr. Wright did not display hallucinations or delusions on examination. *Id*. His drug screen was clean. *Id*.

Mr. Wright did not display any psychotic symptoms at a visit on November 12, 2021. (Tr. 5659). However, Nurse King again noted that Mr. Wright appeared to be experiencing hallucinations as frequently as previously. *Id*. Mr. Wright's drug screen was again clean. (Tr. 5660).

Mr. Wright had a follow-up visit with Nurse King on February 2, 2022. (Tr. 6378). He denied experiencing any psychosis and did not display any evidence of psychosis on examination. (Tr. 6378-79). Mr. Wright reported continuing psychotic symptoms on February 15, 2022, but was not experiencing any symptoms at that time. (Tr. 6383). On February 22, 2022, Mr. Wright reported having bizarre nightmares and experiencing auditory hallucinations most of the day. (Tr. 6388). He reported that he felt like people were following and watching him. *Id*. His drug screen was clean. *Id*. There were no apparent signs of hallucinations, delusions, or other indicators of psychotic process on examination. (Tr. 6389).

On March 22, 2022, Mr. Wright reported that he continued to maintain his sobriety, and his drug screen was clean. (Tr. 6403). He denied experiencing hallucinations or delusions

and there was no evidence of thought disorder on examination. (Tr. 6404). Mr. Wright again denied experiencing delusions or hallucinations on March 29, 2022 and April 1, 2022. (Tr. 5743, 6409).

On April 12, 2022, Mr. Wright reported that his anxiety had worsened. (Tr. 5765). On examination, he was irritable but displayed no signs of hallucinations or delusions. (Tr. 5766). On April 19, 2022, Mr. Wright reported worsening mental health symptoms. (Tr. 5754). He was urged to resume his antipsychotic medication. *Id*. Examination "reveal[ed] no serious mental status abnormalities." (Tr. 5755). On April 26, 2022, Mr. Wright complained of mild auditory hallucinations, and he was prescribed long-acting injections of Invega to treat his symptoms. (Tr. 5759). He did not display signs of hallucination or delusions on examination. (Tr. 5761).

On May 31, 2022, Mr. Wright reported that he continued to experience auditory hallucinations, but that he generally felt pretty good. (Tr. 5905). He also expressed anxiety regarding an upcoming vacation. (Tr. 5915). His dosage of Invega was increased. (Tr. 5907). It was noted that his schizoaffective disorder was established, chronic, and unstable due to external stressors. *Id*. On June 14, 2022, Mr. Wright presented as anxious but reported that he was doing a bit better. (Tr. 5910). He also reported that he continued to hear voices but that they were manageable. *Id*. He remained in compliance with his medication and his drug screen was clean. (Tr. 5911).

On June 21, 2022, Mr. Wright reported ongoing hallucinations. (Tr. 6026). He said that he felt like the voices would never go away and that they were just a part of him. *Id*. On examination, psychotic or borderline psychotic symptoms appeared to be present, and Mr. Wright's behavior indicated that he was experiencing auditory hallucinations. (Tr. 6027).

On June 28, 2022, Mr. Wright reported that he continued to experience loud, high-pitched auditory hallucinations in his left ear. (Tr. 6031). He said that the voices told him they were going to give him cancer and that he was going to die. *Id*. He also said that, at times, the voices were so loud that they gave him headaches. *Id*. On examination, his behavior suggested that he was experiencing hallucinations. (Tr. 6032). His drug screen was again clean. *Id*. His Invega dosage was increased, and his opioid dependence management medication was changed. (Tr. 6033).

On July 5, 2022, Mr. Wright reported no changes from his last follow-up visit. (Tr. 6036). He did not display any signs of psychosis on examination. (Tr. 6037). He was prescribed an increased dose of Saphris. (Tr. 6038). His Sublocade injection for opioid dependence was discontinued due to ineffectiveness. *Id*. On July 12, 2022, Mr. Wright reported that his paranoia had improved after his medication regime was modified. (Tr. 6041). He denied experiencing hallucinations or delusions. (Tr. 6042). He was warned that if he failed to comply with his intensive outpatient program, his visits would be increased to three times per week. (Tr. 6041).

Mr. Wright did not display any serious mental status abnormalities during an examination on July 20, 2022. (Tr. 6047). On July 26, 2022, Mr. Wright presented as disheveled and smelling of urine. (Tr. 6067). He reported some improvement in mood and depressive symptoms and denied any worsening of his psychosis. (Tr. 6066). On examination, he was irritable, defensive, anxious, and fidgety, but did not display signs of hallucinations or delusions. (Tr. 6067).

On August 2, 2022, it was noted that Mr. Wright's drug screen was positive for Klonopin, which he had not been prescribed. (Tr. 6154). He reported that he continued to

experience high anxiety and paranoia. *Id*. He also reported that he was scheduled to begin a job, but that he could not start the job because of his worsening paranoia and auditory hallucinations. *Id*. He was prescribed long-acting injections of Invega 234mg for worsening paranoia and to decrease polypharmacy. *Id*. He was also prescribed Klonopin. (Tr. 6157). On examination, he did not display hallucinations, delusions, or apparent thought disorders. (Tr. 6155).

At a medication management appointment on August 9, 2022, Mr. Wright reported that he had not seen any improvement in his symptoms as a result of his new medications. (Tr. 6159). He again presented smelling of urine and stated that he was not allowed to bathe at home because of his stepfather. (Tr. 6160). He was educated on taking medications as prescribed and on avoiding medications he had not been prescribed. *Id*. He was warned that if he continued to take medications he was not prescribed, his benzodiazepine prescriptions would be discontinued. *Id*. It was also noted that Mr. Wright had been prescribed multiple medications for the same mental health symptoms. *Id*. On examination, he was relaxed, attentive, poorly groomed, and disheveled, and did not display hallucinations or delusions. (Tr. 6161).

On August 23, 2022, Mr. Wright stated that he continued to suffer from auditory hallucinations. (Tr. 6553). He reported that they were faint but caused him difficulty sleeping. *Id*. He said that the voices were telling him lies and threatening him, but also said that medication had been effective in minimizing his symptoms. *Id*. He continued to have difficulties with his personal hygiene. (Tr. 6554).

On August 30, 2022, Mr. Wright received another Invega injection. (Tr. 6559). He reported experiencing tactile and auditory hallucinations. *Id*. He said that his medication

helped him sleep but provided him little relief with his symptoms. *Id*. His drug screen was again clean. (Tr. 6560). On examination he displayed symptoms of depression, anxiety, and hallucinations. *Id*.

Mr. Wright had another follow-up visit with Nurse King on September 6, 2022. (Tr. 6573). He reported that his psychotic symptoms were chronically present. *Id*. Nurse King stated that others' descriptions of Mr. Wright's behavior suggested that auditory hallucinations were occurring. *Id*. On examination, he presented as flat but did not show signs of hallucinations or delusions. (Tr. 6574). Nurse King noted that Mr. Wright's schizoaffective disorder was established, chronic, and unstable. (Tr. 6576). She also noted that Mr. Wright reported hearing voices that caused him to tense up and not expel urine from his bladder completely. *Id*. She further noted that Mr. Wright had delusions that someone was using radio waves or frequencies to mess with his brain. *Id*.

On September 13, 2022, Mr. Wright reported that his auditory hallucinations had somewhat improved but that the voices still made it difficult for him to sleep. (Tr. 6584). He did not display hallucinations or delusions on examination. (Tr. 6585). On September 20, 2022, Mr. Wright requested, and received, an increase in his dosage of Klonopin because his auditory hallucinations were causing him extreme anxiety. (Tr. 6593). He also reported that the voices were keeping him up at night. *Id*. On examination, he was angry, irritable, and anxious, but did not display signs of hallucinations or delusions. (Tr. 6594). On October 4, 2022, Mr. Wright reported that he was learning to manage his auditory hallucinations better. (Tr. 6611).

Mr. Wright had a follow-up visit with Nurse King on March 7, 2023. (Tr. 6771). He reported increased anxiety and depression due to family problems as well as ongoing auditory

hallucinations. *Id*. On examination, he was depressed, but did not show signs of hallucinations or delusions. (Tr. 6772). On March 15, 2023, Mr. Wright reported that his psychosis was moderate in severity, occurred daily, and was worse when he experienced life stressors. (Tr. 6755).

On March 21, 2023, Mr. Wright reported that his symptoms had worsened and that he was experiencing daily psychosis. (Tr. 6748). On March 28, 2023, he said that the voices sounded like a muffled radio and threatened him throughout the day. (Tr. 6741). Mr. Wright saw Nurse King again on May 9, 2023. (Tr. 6732). He continued to report moderate psychosis occurring a few times per day. (Tr. 6732).

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Wright had not engaged in substantial gainful activity since July 1, 2020, the alleged onset date. (Tr. 529). The ALJ also determined that Mr. Wright had the following severe impairments: obesity; schizoaffective disorder; generalized anxiety disorder; ADHD; panic disorder; cannabis abuse disorder; benzodiazepine dependence; and polysubstance abuse. *Id*.

The ALJ next determined that, when including Mr. Wright's addiction issues, his impairments met or medically equaled the severity of Listing 12.03, one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id*. The ALJ also determined that, even when excluding Mr. Wright's substance abuse issues, his impairments remained severe. (Tr. 531). However, the ALJ determined that, excluding Mr. Wright's substance abuse issues, none of his impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments. (Tr. 532).

The ALJ next determined that Mr. Wright had the residual functional capacity

17

("RFC") to:

> perform medium work as defined in 20 CFR 404.1567(c) except he can perform work with simple routine tasks, simple short instructions, simple decisions, occasional workplace changes, no strict production rate or hourly quotas, occasional interaction with co-workers, occasional interaction with supervisors, and no interaction with the public.

(Tr. 533).

The ALJ next determined that Mr. Wright could not perform his past relevant work as a cook or machine operator. (Tr. 537). However, the ALJ also determined that there were jobs existing in significant numbers in the national economy that Mr. Wright could perform, including work as a cleaner, hospital cleaner, or store laborer. (Tr. 538). The ALJ further determined that Mr. Wright's substance abuse disorder was a contributing factor material to the disability determination because he would not be disabled if he stopped the substance use. *Id*. Accordingly, the ALJ determined that Mr. Wright was not disabled. *Id*.

## V.     LAW & ANALYSIS

### A.     <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

18

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.  Standard for Disability

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of

impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g) and 404.1560(c). *See*

*Abbott*, 905 F.2d at 923.

### C.  **Analysis**

In his sole assignment of error, Mr. Wright argues that the ALJ erred in evaluating Nurse King's opinions. Mr. Wright argues that the ALJ wholly failed to address Nurse King's off-task/absenteeism opinion which, he asserts, was supported by and consistent with the record. Mr. Wright also argues that the ALJ's analysis of Nurse King's opinions failed to properly apply the governing regulations because the ALJ mischaracterized the record and ignored evidence that contradicted her findings. Mr. Wright's arguments are well-taken.

Nurse King filled out three separate forms on July 23, 2023: (1) a medical statement opining that Mr. Wright had mild, marked, or extreme limitations in various functional categories; (2) a statement regarding substance abuse, opining that Mr. Wright was not currently abusing drugs or alcohol; and (3) an off-task/absenteeism questionnaire, in which she opined that Mr. Wright would be off-task at least 20% of the time even during periods of sobriety and would be absent from work approximately four times per month.

The parties first dispute whether the forms constitute three separate opinions or one integrated opinion. Mr. Wright argues that they are separate opinions and that the ALJ should have analyzed them separately. (ECF No. 8, PageID # 6974) ("the ALJ's repeated reference to Nurse King's singular opinion indicated a lack of recognition of the existence of Nurse King's Off-Task/Absenteeism Questionnaire"). The Commissioner, by contrast, argues that the three forms constitute a single opinion because they were drafted by Nurse King on the same day and are included as a single exhibit in the administrative record. The Commissioner accuses Mr. Wright of engaging in pedantry and asserts that the ALJ "reasonably considered the three pages a single opinion." (ECF No. 10, PageID # 6991). The Commissioner further

argues that, even assuming the three forms constitute separate opinions, the ALJ is not required to separately address each opinion individually where a medical source issues multiple opinions. *See* 20 C.F.R. § 404.1520c(b)(1).

I agree with the Commissioner that the three questionnaires, which Nurse King filled out on the same day and which were combined into one exhibit in the administrative record—are best treated as a single exhibit. I nonetheless agree with Mr. Wright that the ALJ committed reversible error because nothing in the ALJ's opinion suggests that the ALJ considered Nurse King's off-task or absenteeism opinions at all.

Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996). The ALJ's analysis here does not explain why the ALJ found Nurse King's opinions unpersuasive with respect to Mr. Wright's absenteeism or ability to stay on task. Moreover, while a reviewing court must read the ALJ's decision as a whole, *see Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021), the remainder of the ALJ's decision also does not enable me to trace the ALJ's reasoning on this issue.

Indeed, reading the decision as a whole, it is unclear whether the ALJ took Nurse King's off-task/absenteeism opinions into account at all. The ALJ's summary of Nurse King's opinions cited only to her medical statement regarding depression, bipolar, and related disorders, and it did not reference either her statement regarding substance abuse or her off-task/absenteeism questionnaire. (Tr. 536). Because the ALJ's analysis was limited to the opinions contained in the first questionnaire, I cannot determine if, and to what extent, the ALJ considered Nurse King's other opinions. *See Whalen v. Comm'r of Soc. Sec.*, No. 1:24-

CV-01928-SL, 2025 WL 1452713, at *12 (N.D. Ohio May 21, 2025) (report and recommendation) (holding that remand was required where ALJ "never mentioned [medical source's] finding that [claimant] would be off-task more than 25% of the time"). The error is also not harmless, because the VE testified that it would be work-preclusive if an individual were absent from work three times per month or needed two additional 15-minute breaks during the day. (Tr. 564, 566); *Whalen*, 2025 WL 1452713 at *11.

Even assuming the ALJ was not required to separately discuss Nurse King's off-task/absenteeism questionnaire, I remain troubled by the ALJ's handling of Nurse King's opinions as a whole. Because Mr. Wright filed his disability claim after March 27, 2017, the "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). Instead, the current regulations stated that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all

of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

In finding that Nurse King's opinions were unpersuasive, the ALJ stated as follows:

> The undersigned also considered the opinion of Ashley King, MSN-ED. Ms. King opined that the claimant experiences: (1) marked limitations interacting with others; (2) extreme limitations concentrating, persisting, or maintaining pace; and (3) extreme limitations adapting or managing oneself (Exhibit 39F, p.1). Ms. King does not list a substance addiction disorder in the list of diagnoses forming the basis for this opinion (See Exhibit 39F, p.1). The undersigned finds the opinion to be unpersuasive. Ashley King works for KC Center for Health and Wellness (See Exhibit 17F, p.286). As described above, the recent examination notes do not support any significant, abnormal findings. While his examiners note some restless, fidgety behavior, he remains attentive throughout the examination (See, e.g., Exhibits 27F, p.17; 28F, p.7; 29F, p.7; 34F, p.10). Despite some irritability, defensiveness, and anxiety, he retains cooperative behavior (See, e.g., Exhibits 27F, p.17; 28F, p.7; 29F, p.7; 34F, p.10). His examiners indicate that there "are no apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process" (See, e.g., Exhibits 27F, p.17; 34F, p.5, 10, 21, 26). His examiners further describe his: (1) associations as intact; (2) thinking as logical: (3) thought content as appropriate; (4) cognitive functioning as intact; (5) fund of knowledge as intact; (6) insight as fair; and (7) judgment as fair (See, e.g., Exhibit 34F, p.5, 10, 21, 26). Moreover, Ms. King's opinion is inconsistent with the claimant's improvement during inpatient hospitalizations or rare, conservative treatment during periods of sobriety.

(Tr. 536-37).

There are two main problems with the ALJ's analysis. First, the ALJ's statement that examiners found no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process is not entirely accurate. It is true that Nurse King and other treatment

providers often noted that Mr. Wright did not display signs of hallucinations on examination. (*See*, *e.g.*, Tr. 5660, 5755, 6042, 6384). However, on at least three occasions, examiners expressly noted that Mr. Wright displayed signs of auditory hallucinations during examinations even while his drug screens did not show the presence of any improper substances. (Tr. 6026, 6032, 6560). The ALJ did not discuss any of these instances, and thus misstated the record when the ALJ suggested that Mr. Wright consistently failed to display hallucinations or other indicators of psychotic processes on examination.

"When an ALJ's reasoning is 'based in part on an inaccurate description of evidence,' courts have 'repeatedly . . . held that the ALJ failed to build an accurate and logical bridge between the evidence and the result.'" *Buchanan v. O'Malley*, No. 5:24-cv-00009, 2025 WL 1009095, at *3 (N.D. Ohio Apr. 4, 2025) (Ruiz, J.) (quoting *Figueroa ex rel. E.A.R.F. v. Comm'r of Soc. Sec. Admin.*, No. 1:20cv1765, 2021 WL 6280389, at *14 (N.D. Ohio Dec. 13, 2021)); *see also Higginbotham v. Comm'r of Soc. Sec.*, No. 1:23-CV-1526, 2024 WL 2000570, at *9 (N.D. Ohio Apr. 16, 2024) (holding that remand was warranted where ALJ made multiple misstatements of the record and failed to discuss parts of treatment record not aligning with ALJ's findings), *report and recommendation adopted*, 2024 WL 1996425 (N.D. Ohio May 6, 2024); *Martin v. Comm'r of Soc. Sec.*, No. 3:18-cv-219, 2020 WL 32507, at *5 (N.D. Ohio Jan. 2, 2020) (remanding case where ALJ "misstated that [claimant] presented with no pain on three separate occasions").

Second, while the ALJ's analysis, on its face, addresses both supportability and consistency, the ALJ failed to discuss evidence that undermines the ALJ's conclusions. As just noted, the ALJ did not discuss visits during which Mr. Wright displayed signs of psychosis and auditory hallucinations, even during periods of sobriety. (Tr. 6026, 6032,

6560). Moreover, the ALJ failed to acknowledge Mr. Wright's consistent reports to Nurse King and others that he was experiencing daily or near-daily hallucinations for an extended period of time, even after his drug screens began showing that he was not using any substances other than his prescribed medications.

Notably, Nurse King appears to have taken Mr. Wright's statements seriously. She adjusted his medications on multiple occasions, adding injections of Invega to his treatment regimen to control psychosis and increasing the dosage when Mr. Wright continued to report symptoms. (Tr. 5759, 5907, 6033, 6154). On at least two occasions, Nurse King also stated that Mr. Wright's claims of paranoia and hallucinations were corroborated by the reports of third parties who observed him acting unusually. (Tr. 5678, 6573). In addition, Nurse King stated in treatment notes that Mr. Wright's schizoaffective disorder was chronic and unstable. (Tr. 5907, 6576). The ALJ did not reference any of this evidence, and instead simply stated that Mr. Wright received conservative treatment and that examiners did not notice any signs of hallucinations or psychosis. (Tr. 536-37).

The Commissioner correctly argues that the ALJ was not required to discuss every piece of evidence in the record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) ("it is well settled that . . . 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party'") (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). However, an ALJ "must base the final determination on the record as a whole *and* must sufficiently explain his or her reasoning so a reviewing court can conduct a *meaningful* review." *Cross on behalf of K.C. v. Comm'r of Soc. Sec.*, No. 5:20-cv-2787, 2022 WL 574260, at *5 (N.D. Ohio Feb. 25, 2022). "In rendering [her] RFC decision, the ALJ must give some

26

indication of the evidence upon which [she] is relying, and [she] may not ignore evidence that does not support [her] decision, especially when that evidence, if accepted, would change [her] analysis." *Renfrow v. Comm'r of Soc. Sec. Admin.*, No. 3:24-CV-00946-JJH, 2024 WL 5158962, at *7 (N.D. Ohio Dec. 18, 2024) (quotations omitted), *report and recommendation adopted*, 2025 WL 959528 (N.D. Ohio Mar. 31, 2025); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 n.5 (6th Cir. 2007) ("In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is 'substantial' only when considered in isolation.") (quoting *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)).

Because the ALJ did not discuss evidence regarding Mr. Wright's continued auditory hallucinations and ongoing treatment, even during periods of sobriety, it is unclear whether the ALJ rejected that evidence as not credible or whether the ALJ simply failed to consider it in the first place. Remand is warranted to address the inconsistencies between the ALJ's reasons for discounting Nurse King's opinions and the evidence that potentially contradicts the ALJ's findings. *See Daub v. O'Malley*, No. 5:23-CV-01107, 2024 WL 4314769, at *4 (N.D. Ohio Sept. 27, 2024) ("Ultimately, because the ALJ failed to address the conflict between [the] evidence and his characterizations and conclusions, he failed to build the requisite accurate and logical bridge between the evidence and the result."); *Buchanan*, 2025 WL 1009095 at *3 (holding that remand was required where ALJ mischaracterized evidence regarding plaintiff's shoulder pain and carpal tunnel syndrome and overlooked or ignored contrary evidence relevant to analysis).

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the

Commissioner's final decision and REMAND the case to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated: June 26, 2025

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent

appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).